1    DAVID C. SCHEPER (SBN: 120174)
     dscheper@winston.com
2    LARA MARKARIAN (SBN: 327345)
     lmarkarian@winston.com
3    WINSTON & STRAWN LLP
     333 S. Grand Avenue
4    Los Angeles, CA 90071
     Telephone:  (213) 615-1700
5    Facsimile:  (213) 615-1750

6    Attorneys for Defendant
     NICHOLAS GARDNER

7

8

9                **UNITED STATES DISTRICT COURT**

10              **CENTRAL DISTRICT OF CALIFORNIA**

11    UNITED STATES OF AMERICA,     **Case No. 2:22-cr-00147-PSG**

12               Plaintiff,

13             v.                     **DEFENDANT NICHOLAS**
                                      **GARDNER'S MEMORANDUM RE**
14    NICHOLAS GARDNER,          **EVIDENTIARY HEARING**

15             Defendant.       Judge: Hon. Philip S. Gutierrez
                                      Courtroom: First Street Courthouse, 6A
16

17                                 Hearing:  January 11-12, 2023

18

19

20

21

22

23

24

25

26

27

28

1    Defendant Nicholas Gardner, by and through his counsel of record, hereby files

2 his memorandum regarding the evidentiary hearing scheduled for January 11 and 12,

3 2023. This memorandum is based upon the attached memorandum of points and

4 authorities, the files and records in this case, and such further evidence and argument

5 as the Court may permit.

6

7 Dated:  January 9, 2023                    WINSTON & STRAWN LLP

8

9                                            By:    /s/ David C. Scheper
                                                    David C. Scheper
10                                                   Lara Markarian

11                                                   Attorneys for Defendant
                                                     NICHOLAS GARDNER

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF CONTENTS</u>

2

<u>Page</u>

3

I.      Introduction ......................................................................................... 1

4

II.     Investigative History .......................................................................... 2

5

III.    Mr. Gardner's Intentions at the Hearing ........................................... 4

6

IV.     Burden of Proof ................................................**Error! Bookmark not defined.**

7

V.      Conclusion .......................................................................................... 8

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **TABLE OF AUTHORITIES**

2

**Page**

3

**Cases**

4

5

*OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc.*,
   897 F.3d 1008 (9th Cir. 2018) ...................................................................6

6

7

*United States v. Gutierrez*,
   843 Fed.Appx. 60 (9th Cir. 2021) .........................................................7

8

9

*United States v. Hymas*,
   780 F.3d 1285 (9th Cir. 2015) ...............................................................6

10

11

*United States v. Jordan*,
   256 F.3d 922 (9th Cir. 2001) .................................................................7

12

13

*United States v. Pike*,
   473 F.3d 1053 (9th Cir. 2007) ...............................................................7

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT'S MEMORANDUM RE EVIDENTIARY HEARING

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

### I.    Introduction

3    HCT has aggressively pursued Nicholas Gardner for six years and has stopped

4    at nothing to achieve its goal of wiping him out.  The first arena for HCT's mission

5    was Los Angeles County Superior Court.  But on two occasions, HCT sought to open

6    a second front in its pursuit of Mr. Gardner—federal law enforcement.  Rebuffed in

7    2017, HCT tried again in 2019.  In fact, the hearing in this matter coincides with the

8    four-year anniversary of a meeting attended by HCT's then-Chief Strategy Officer

9    Jenny Hsu, HCT's outside counsel, three Assistant United States Attorneys and an

10   FBI agent.  It was on that day, January 11, 2019, that the government adopted HCT's

11   narrative in whole cloth and launched the investigation that brings us together.  For

12   years, Mr. Gardner showed the government that its decision to pursue this case

13   criminally was based upon fundamentally false information provided to the

14   government by HCT's Jenny Hsu with the backing of her boss, Tim Thorpe.  Mr.

15   Gardner will prove this to the Court.

16       There is no dispute that Mr. Gardner received side income in the amounts the

17   government presents.  He has pleaded guilty to failure to report the foreign bank

18   account into which his side income was deposited.  But Mr. Gardner did not commit

19   honest services fraud.  He made Tim Thorpe rich and increased HCT's profitability

20   dramatically.  He meant HCT no harm, and did HCT no harm – quite the opposite.

21   And in securing the services of Fortune and JC Packaging to manufacture or source

22   the manufacture of several of HCT's products, he made HCT's customers happy.

23   Both Mr. Gardner and Mr. Chang chose Fortune and JC Packaging because they were

24   the best.  Contrary to Jenny Hsu's false narrative, Fortune not only was not a rogue

25   manufacturer, but was in fact known to and respected by Tim Thorpe and Jenny Hsu

26   themselves.  Indeed, it was HCT's number-one manufacturer year after year.  And

27   contrary to Count One of the Information against Mr. Gardner, JC Packaging did not

28   "pose" as a manufacturer, and it too was well-regarded by HCT.  In sum, Mr. Gardner

1  will show the Court that the government's effort to enhance his guidelines range rests

2  upon a demonstrably false narrative.

3  **II.    Investigative History**

4  On January 13, 2017, little more than a week after it both fired and sued

5  Nicholas Gardner, HCT sent three investigators, two of them retired FBI agents, to the

6  FBI Los Angeles Field Office, where the retired FBI agents had previously worked,

7  with the goal of persuading the FBI to open a criminal investigation targeting

8  Nicholas Gardner on a theory of honest services fraud.  Six weeks later, on February

9  27, 2017, the FBI declined to investigate, concluding that, "[t]he allegations against

10  Gardner appear to a breach of his employment contract rather than a criminal violation

11  pending additional findings."  In other words, the FBI concluded that the dispute

12  between HCT and Mr. Gardner was a civil matter, not worthy of federal criminal

13  investigation.

14  In the summer of 2018, eighteen months after suing Mr. Gardner, HCT fired its

15  outside counsel and replaced it with O'Melveny & Myers.  Then, two years into

16  extensive and expensive civil litigation, HCT turned once again to the federal

17  government for help in its campaign against Mr. Gardner.  This time, on January 11,

18  2019, HCT sent its chief strategy officer, Jenny Hsu, along with outside counsel, to

19  the United States Attorney's Office ("USAO" or "government") for a meeting with a

20  team of prosecutors and an FBI agent.  During the meeting, Ms. Hsu and HCT shared

21  a PowerPoint presentation purporting to depict how Mr. Gardner and his codefendant,

22  Derrick Chang, entered into a scheme to defraud HCT and deprive HCT of their

23  honest services.  Based upon Ms. Hsu's presentation, which was riddled with

24  deception and outright falsehoods, the government opened an investigation that has

25  extended almost four years, yet generated minimal actual investigating.

26  The government has had several chances to revisit its misguided decision to

27  launch a criminal investigation after two years of civil litigation.  The first opportunity

28  came on April 11, 2019, when counsel for Messrs. Gardner and Chang presented to

the government a PowerPoint of their own, entitled "Anatomy of a Deceptive Referral."  That presentation detailed multiple falsehoods and deceptions in Jenny Hsu's January 11, 2019 presentation and set forth other reasons why the government should leave the honest services case in its civil forum.  Six weeks later, Mr. Gardner's counsel sent the government a letter summarizing why the criminal investigation should be closed.  Copies of the Hsu January 11 slide deck, the April 11 Gardner/Chang slide deck, and Mr. Gardner's May 22, 2019 letter will be presented as exhibits at the hearing.

Counsel's effort to dissuade the government failed.  We now know, through discovery provided by the government after Mr. Gardner's May 20, 2022 entry of a guilty plea,[1] that the government did in fact "investigate."  The government interviewed Jenny Hsu in March 2019 and April 2020.  It interviewed Tim Thorpe, HCT's then-CEO and Ms. Hsu's boss and close friend, also in April 2020.  In June 2020, the government negotiated a plea agreement with Derrick Chang, and interviewed Mr. Chang on June 23, 2020 (and again on October 20, 2022, five days before the date previously set for this hearing).

On October 5, 2020, Mr. Gardner consented to an interview by the government, which generated a sixteen-page report of the interview.  During his interview, Mr. Gardner disclosed to the prosecutors a defense to honest services fraud, namely that his receipt of outside income was known both to Tim Thorpe and his father, Chris Thorpe, a founder of HCT and a surrogate father to Mr. Gardner.  Tellingly, neither Tim Thorpe nor any other member of the Thorpe family (Chris Thorpe is deceased) is even mentioned in the government's hearing memorandum.  Given the impeachment material concerning Tim Thorpe that Mr. Gardner has shared with the government, it is not surprising that the government has effectively "cancelled" him from its case, as he is not listed as a government witness.  But Tim Thorpe remains central to Mr.

---

[1] Mr. Gardner pled guilty to Count Two of the Information for failure to report a foreign bank account.

1    Gardner's defense, and his absence is significant.

2          In the several months that followed Mr. Gardner's interview, Mr. Gardner's

3    civil counsel took sworn testimony from Tim Thorpe and Jenny Hsu three times each,

4    and also deposed HCT's then-chief financial officer, James Illson.  Mr. Gardner's

5    counsel sent the videotaped testimony of Jenny Hsu, Tim Thorpe, and James Illson to

6    the government and implored the government team to watch their depositions and

7    study not just what they said, particularly Mr. Thorpe and Ms. Hsu, but how they said

8    it in order to evaluate their credibility.  On August 5, 2021, Mr. Gardner's criminal

9    counsel presented by Zoom and thereafter physically delivered to the government a

10   hard copy of a slide presentation, based upon the sworn deposition testimony and

11   contemporaneous documents, confirming that Jenny Hsu and Tim Thorpe had lied

12   repeatedly, both to the government in their interviews and in their depositions, and in

13   the case of Ms. Hsu, when she and counsel referred the case to the USAO four years

14   ago.  This August 5 slide presentation will be presented as an exhibit at the hearing.

15         In November 2021, Mr. Gardner's counsel sent still more material to the

16   government, including a declaration from a former HCT engineer named Scott Desson

17   and a summary of the deposition testimony of Amy Zunzunegui, an employee of one

18   of HCT's largest customers, Urban Decay.  Among other things, these materials,

19   which will be exhibits at the hearing, confirmed that Urban Decay insisted that

20   Fortune manufacture its products.  Ms. Zunzunegui and Mr. Desson also chronicled

21   the Thorpe family's attitude toward foreign bank accounts (receptive and

22   encouraging), appreciation of side payments, and impeachment evidence relating to

23   Tim Thorpe.  The government never contacted either person.

24         In sum, Mr. Gardner will show both a failure of proof and a failure of

25   investigation.

26   **III.    Mr. Gardner's Intentions at the Hearing**

27         The government intends to start its evidentiary presentation with the testimony

28

4

of Jenny Hsu, who last worked at HCT in July 2020.[2]  Mr. Gardner intends to impeach her through contemporaneous HCT documents and previous statements and testimony.

The government will also elicit testimony from Derrick Chang.  Based upon Mr. Chang's June 23, 2020 interview report and a supplemental interview report from October 20, 2022, we expect Mr. Chang's testimony to be materially impeaching of Jenny Hsu's (and Tim Thorpe's) credibility and the factual underpinnings of the government's case.

Unilaterally declaring itself judge and jury, the government seeks to elicit testimony from FBI Agent Cherney regarding what it asserts were false statements made during Mr. Gardner's October 5, 2020 proffer.  While his memory of past events (in some instances more than ten years) was not perfect, Mr. Gardner disputes that there were any material falsehoods in his proffer.  He remains entitled to the protections provided by the proffer letter which prohibits the government from using his statements as evidence in its case-in-chief.  Mr. Gardner requests that this Court consider this matter before Agent Cherney is allowed to testify.

**IV.   Burden of Proof**

Counsel for Mr. Gardner confesses to be confounded by the government's approach to many aspects of this case, including the standard of proof.  On the one hand, the government suggests, twice, that the Court's decision is academic since the government will meet any burden the Court imposes (*See* Government Memorandum at p. 14, lines 1-3 and p. 16, lines 9-12 (Dkt. No. 31)), but on the other hand proposes a lower burden of proof (preponderance) while ignoring the unique circumstances of this case.

For context, the government predicated its decision to open a criminal investigation against Messrs. Gardner and Chang on honest services fraud.  Count

---

[2] Counsel for Mr. Gardner is prepared to deliver a brief opening statement if the Court would find it helpful.

One of the Information in the case borrows heavily from the January 11, 2019 Jenny Hsu slide deck, which, in turn, borrows heavily from the Second Amended Complaint in the civil case.  The government did not base its decision to investigate in the least on Mr. Gardner's failure to report a foreign bank account.  Indeed, it could not do so because at the time the government met with Jenny Hsu four years ago, Mr. Gardner was enrolled in the IRS's Voluntary Offshore Disclosure program and had paid the IRS hundreds of thousands of dollars.

It is normally the case that when the USAO accepts an honest services case for investigation and prosecution, it is with the assumption that the evidence sought and obtained will meet the criminal standard of proof beyond a reasonable doubt.  The government suggests that it can and will meet this burden, concedes that it wants to increase Mr. Gardner's sentencing exposure based on an honest services fraud conspiracy, but then asks to be held only to the burden of proof governing *civil* lawyers *in non-fraud cases*.  In civil fraud cases in California, the burden of proof is clear and convincing evidence, a higher standard than what the government argues for here.  *See, e.g., OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc.*, 897 F.3d 1008, 1020 (9th Cir. 2018).  This is anomalous to say the least, where federal prosecutors seek years of additional prison exposure while not even taking on the burden of proof of a parallel civil case.[3]  Surely a criminal defendant facing a lengthened sentence as a result of an allegation of honest services fraud has an interest at stake at least as great as that of a civil counterpart facing civil fraud claims.

There is no dispute that district courts generally use the preponderance of the evidence standard of proof during sentencing enhancement hearings.  See *United States v. Hymas*, 780 F.3d 1285, 1298-90 (9th Cir. 2015).  However, courts have identified an exception to this general rule "when a sentencing factor has an extremely disproportionate effect on the sentence relative to the offense of conviction."  *Id*. at 1289.  This is such a case.

[3] The civil case has been stayed pending this Court's ruling.

1    Courts look to the totality of the circumstances in determining whether the

2    extremely disproportionate test is met.  *United States v. Pike*, 473 F.3d 1053, 1057

3    (9th Cir. 2007).  There is no bright-line rule.  *Id*.  Accordingly, the application of the

4    six factors commonly used by courts and described by the government in its

5    memorandum "are fact-specific and defendant-specific, as revealed by cases in which

6    we have applied different evidentiary standards to co-defendants in the same

7    proceeding."  *United States v. Gutierrez*, 843 F. App'x 60, 64 (9th Cir. 2021).  In

8    addition, the factors "may not necessarily exhaust all possible circumstances relevant

9    to our due process assessment."  *United States v. Jordan*, 256 F.3d 922, 928 (9th Cir.

10    2001).

11    In this case, while the government would like the Court to focus only on factors

12    (5) and (6), there are other pertinent factors that the Court should consider,

13    particularly because this is a unique case with little to no precedent.  For example, the

14    court should consider factor (3) – whether the facts offered in support of the

15    enhancement create new offenses requiring separate punishment.  Mr. Gardner's count

16    of conviction, Count Two for failing to file a report of a foreign bank account, has no

17    relation to the government's desired enhancements based on honest services fraud.

18    Therefore, this evidentiary hearing is based on new facts for a new offense that

19    requires a separate punishment, exactly what is contemplated in factor (3).  In

20    addition, factor (2) – whether the enhanced sentence negates the presumption of

21    innocence or the government's burden of proof for the crime alleged – should apply

22    here.  As mentioned above, the government requests this four-level sentence

23    enhancement based entirely on allegations of honest services fraud.  Mr. Gardner has

24    specifically entered a not guilty plea to Count One of the Information for honest

25    services fraud.  By seeking sentencing enhancements based upon Count One, Mr.

26    Gardner's presumption of innocence is clearly threatened.

27    Further, while a lower standard of proof may make sense in some situations,

28    here, the government is not only asking for a four-point sentence enhancement but

7

also monetary restitution for HCT.  Concurrently, HCT is prosecuting the civil equivalent of the honest services claim in a civil case and also seeking restitution.  It is contrary to logic and principles of fairness to have simultaneous proceedings with differing standards of proof but overlapping punishments, with the standard of proof *higher* in the civil than the criminal case.

In light of the circumstances present here, it is little wonder that the government strains so hard for a preponderance standard to apply, notwithstanding its assertion that it will meet the proof beyond a reasonable doubt standard.  In almost four years, the government has interviewed only a handful of former HCT employees, but not the CFO, no one from human resources, no project managers other than Mr. Chang, not to mention no customers and no manufacturers.  As a matter of both law and principle, the Court should require the government to prove by clear and convincing evidence that Mr. Gardner was engaged in a conspiracy to commit honest services fraud.

## V.     Conclusion

For the reasons summarized above and to be further developed at the hearing, Mr. Gardner expects the Court will find that the enhancements sought will not be proved under any standard, after which the matter will proceed through the pre-sentence process.

Dated:  January 9, 2023                              WINSTON & STRAWN LLP

By:     */s/ David C. Scheper*
David C. Scheper
Lara Markarian

Attorneys for Defendant
NICHOLAS GARDNER