DAVID C. SCHEPER (SBN: 120174)
dscheper@winston.com
LARA MARKARIAN (SBN: 327345)
lmarkarian@winston.com
WINSTON & STRAWN LLP
333 S. Grand Avenue
Los Angeles, CA 90071
Telephone:   (213) 615-1700
Facsimile:    (213) 615-1750

Attorneys for Defendant
NICHOLAS GARDNER

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | **Case No. 2:22-cr-00147-PSG** |
|---|---|
| Plaintiff, | |
| v. | **DEFENDANT NICHOLAS GARDNER'S CLOSING BRIEF RE EVIDENTIARY HEARING** |
| NICHOLAS GARDNER, | |
| Defendant. | Judge: Hon. Philip S. Gutierrez<br>Courtroom: First Street Courthouse, 6A |
| | Hearing:   March 22, 2023 |

1        Defendant Nicholas Gardner, by and through his counsel of record, hereby files

2    this closing brief regarding the evidentiary hearing that occurred on January 11 and

3    12, 2023.

4

5    Dated:  March 3, 2023         WINSTON & STRAWN LLP

6

7                      By:   */s/ David C. Scheper*

                        David C. Scheper

8                            Lara Markarian

9                            Attorneys for Defendant

                        NICHOLAS GARDNER

# **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     LEGAL STANDARD ...........................................................................................1

III.    ARGUMENT.........................................................................................................3

      A.      The Evidence Shows that HCT Knew About and Condoned Mr.
             Gardner's Side Income.................................................................................3

      B.      The Government has not Demonstrated an Intent to Defraud HCT. .........9

      C.      The Government has not Demonstrated that the Payments Made to
             Mr. Gardner Were Kickbacks. .................................................................11

      D.      Burden of Proof........................................................................................16

      E.      The Government has Failed in its Investigation, Leading to its Failure
             of Proof.....................................................................................................17

IV.     CONCLUSION ...................................................................................................20

i

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

**Cases**

*OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc.*,
    897 F.3d 1008 (9th Cir. 2018) ........................................................................ 16

*U.S. v. Brown*,
    459 F.3d 509 (5th Cir. 2006) ............................................................................ 9

*U.S. v. Christensen*,
    828 F.3d 763 (9th Cir. 2015) ............................................................................ 3

*United States v. Gutierrez*,
    843 F. App'x 60 (9th Cir. 2021) ..................................................................... 16

*United States v. Hymas*,
    780 F.3d 1285 (9th Cir. 2015) ................................................................... 16, 17

*United States v. Nosal*,
    2009 WL 981336 (N.D. Cal. Apr. 13, 2009) ................................................... 4

*United States v. Skilling*,
    561 U.S. 358 (2010) ................................................................................ 2, 11, 12

**Statutes**

18 U.S.C. § 201 ....................................................................................................... 3

18 U.S.C. § 1343 ..................................................................................................... 1

18 U.S.C. § 1346 ..................................................................................................... 1

Cal. Penal Code § 641.3 ......................................................................................... 3

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    Introduction

"So is it Mr. Thorpe or is it Ms. Hsu who wants justice?"  That question, posed by the Court at the beginning of the second day of the evidentiary hearing, encapsulates one of the many glaring problems with this case.  *See* January 12, 2023 Hearing Transcript ("Day 2 Tr."), 3:13.[1]  The United States Attorney's Office ("USAO" or "government") has purported to pursue this case on behalf of the "victim" corporation – HCT – for over four years.  But as made clear to the Court in January, throughout this case HCT has been none other than and indistinguishable from (1) Tim Thorpe, the company's former CEO and son of its owners and (2) Jenny Hsu, its former chief strategy officer (and Tim Thorpe's close friend).  In an attempt to support an honest services fraud case against Nicholas Gardner, Mr. Thorpe and Ms. Hsu have repeatedly made false statements to the federal government, committed perjury in the parallel civil proceeding and, in the case of Ms. Hsu, committed perjury on January 11 and 12 in this Court.  Yet the government, rather than castigating these two for their many falsehoods, chose to rely on Jenny Hsu's incredible (as in thoroughly not credible) testimony, hide Tim Thorpe, and ignore evidence contrary to its narrative presented by Mr. Gardner since 2019 and by Derrick Chang at the January hearing.  As a result, the government has utterly failed to meet any burden of proof that this Court may apply.  Because of the government's failure of proof, and the underlying failure to investigate, Mr. Gardner should not be subjected to the sentencing enhancements the government seeks.

### II.    Legal Standard

This hearing is an attempt by the government to litigate Count One of the Information – conspiracy to commit wire fraud involving deprivation of honest services, in violation of 18 U.S.C. §§ 1343 and 1346 – to which Mr. Gardner has

---

[1] References to the transcript from the first day of the hearing are presented as "Day 1 Tr." and the second day as "Day 2 Tr."

pleaded not guilty.  As acknowledged by the government, to prove honest services fraud, it has the burden of establishing that: (1) Mr. Gardner devised or knowingly participated in a scheme or plan to deprive HCT of its right of honest services; (2) the scheme or plan consisted of a bribe or kickback in exchange for Mr. Gardner's services; (3) Mr. Gardner owed a fiduciary duty to HCT; (4) Mr. Gardner acted with the intent to defraud by depriving HCT of its right of honest services; (5) Mr. Gardner's act was material, that is, it had a natural tendency to influence, or was capable of influencing an entity's acts; and (6) Mr. Gardner used, or caused to be used, an interstate or foreign wire communication to carry out or attempt to carry out an essential part of the scheme.  *See* Government Mem. at. 12 (Dkt. No. 31); *see also* Manual of Model Criminal Jury Instructions, 9th Circuit, 2022 Edition.

The government is pursuing this case on the basis that Mr. Gardner violated his fiduciary duty to HCT by receiving kickbacks from an HCT supplier.  A kickback, as defined by the Supreme Court in *United States v. Skilling*, means "any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided, directly or indirectly, to [enumerated persons] for the purpose of improperly obtaining or rewarding favorable treatment in connection with [enumerated circumstances]."  561 U.S. 358, 412-413 (2010).

The government has not met its burden.  The facts show that Mr. Gardner did not devise or knowingly participate in any scheme or plan to deprive HCT of anything, and Mr. Gardner never had any intent to defraud HCT.  In fact, under Mr. Gardner's guidance and decision making, HCT prospered financially and improved its reputation with the top cosmetic companies in the world.  The evidence also shows that Mr. Gardner (and Mr. Chang) directed work to Fortune because it provided the best products and service to HCT and its customers and not in exchange for any financial benefit.  The relevant and disputed elements are further described in this brief.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### III.    Argument
#### A.    The Evidence Shows that HCT Knew About and Condoned Mr. Gardner's Side Income.

The Court specifically asked whether it is a violation of honest services if the employer knows and accepts the alleged "kickback." (Day 2 Tr., 113:18-22.) Although the elements of honest services fraud do not *expressly* reference lack of the employer's knowledge or consent, it is only logical that in cases where a defendant acts with his employer's knowledge or consent, the government would fail to satisfy its burden of proving that the defendant knowingly participated in a scheme to deprive his employer of its right of honest service and specifically intended to deprive his employer of that right.

It is also of note that under California Penal Code 641.3 for commercial bribery, a similar crime to the one alleged here, an employee must accept or agree to accept money "corruptly and ***without the knowledge or consent of the employer***, in return for using or agreeing to use his or her position for the benefit of that other person." (Emphasis added.) While this is not a state bribery case, honest services fraud requires a scheme or plan consisting of a *bribe or kickback* in exchange for defendant's services, so review of this bribery standard is pertinent. In analyzing an honest services fraud bribery case, the Ninth Circuit in *U.S. v. Christensen* observed that the principal federal statute defining bribery (18 U.S.C. § 201) generally applies only to federal public officials. 828 F.3d 763, 785 (9th Cir. 2015). Thus, in private sector bribery cases, federal courts may look to state law for the definition of bribery – e.g., California Penal Code § 641.3, which has an express lack of knowledge or consent standard.

Mr. Gardner has not found any cases that deal directly with the question of "can there be honest services fraud if the company knew about or endorsed the alleged payments?", especially in a situation like that alleged. One reason for the lack of cases on point is likely that most of the cases involving honest services fraud in

federal courts include bribes and kickbacks to public officials, where there is less possibility of ratification of conduct as opposed to a private, family-run business like HCT during the Thorpe/Hsu era. *See United States v. Nosal*, 2009 WL 981336, at *8 (N.D. Cal. Apr. 13, 2009) ("[T]he honest services doctrine has mainly been used to punish fraud against citizens perpetrated by government officials… courts have been hesitant to impose federal liability upon every private dispute involving an employee transgression that incurs no public deprivation of rights.") (internal citations omitted). In the same vein, it is inappropriate to compare this case to cases involving large companies such as Enron, Cisco, or Netflix.  Whereas in those cases the publicly traded corporation is distinct from any individual director or executive, here, it is indisputable that HCT was interchangeable with the "Thorpe family business" at the time of the charged conduct.  As noted by the Court, "[HCT] acts through its people." (Day 2 Tr., 3:12.)  Even Ms. Hsu testified that the company was founded and owned by an individual, "Chris Thorpe" (Day 1 Tr., 9:4-9), and that HCT's outside interests in suppliers are one and the same as the Thorpe family's outside interests in suppliers (Day 2 Tr., 27:6-22).  In fact, Ms. Hsu, when asked if the Thorpe family's financial interest in factories that do business with HCT was "[k]nown, condoned, tolerated among the Thorpe family," replied, "[d]isclosed and authorized, absolutely.  I mean, they—I guess they are disclosing it to themselves as owners of HCT." (Day 2 Tr., 27:20-22.)

From the very beginning of the civil case in 2017, Tim Thorpe and Jenny Hsu have been the face and voice of HCT.  Notably, when O'Melveny presented the case in 2019, the presentation identified CEO Tim Thorpe and CSO Jenny Hsu as "HCT" in the slide deck.  *See* Ex. 102, at 3.  And things haven't changed.  In 2023, six years after the case was first shopped to the government, Ms. Hsu, long since separated from HCT, was the government's only HCT representative.  There were **no other** HCT executives or managers even interviewed during the investigation, much less presented at the hearing.  Though government counsel strained to assert that HCT as

4

an entity was owed a fiduciary duty (even from Chris Thorpe) distinct from the Thorpe family (Day 2 Tr., 116:20-117:5), the only evidence before the Court as to HCT's command structure is Ms. Hsu's unequivocal testimony that it was the Thorpe family, not an entity, that had the power to "know, condone and tolerate" an employee having financial interests in factories doing business with HCT.  (Day 2 Tr., 27:20-22.)

There are only four people involved in this case that had or have knowledge of whether Mr. Gardner's conduct was ratified by or known to HCT's leadership.  The first, Chris Thorpe, founder and former CEO of HCT, father of Tim Thorpe, and a surrogate father to Mr. Gardner, was knowledgeable about, applauded, and encouraged Mr. Gardner's following the Thorpe family practice of earning side income, but Chris Thorpe is now deceased.  *See* Government Ex. 18, at 4, 16.  The second, Mr. Gardner, disclosed to the prosecutors during his November 5, 2020 interview that both Tim Thorpe and Chris Thorpe knew of Mr. Gardner's receipt of outside income.  *See* Government Ex. 18, at 15-16.

The third is Jenny Hsu.  As aptly put by the Court during the hearing, Ms. Hsu is not "credible at all."  (Day 2 Tr., 3:5-9.)  The Court continued, "Well, if I think she's a liar, why are you going to redirect?  I mean—she's not told the truth about some material things.  So you want to redirect to do what, some more perjury?"  (Day 2 Tr., 4:1-4.)  Later, before Ms. Hsu returned to the witness stand, the Court told the government, "It's your bus.  Drive it off the cliff.  Go ahead.  I'll watch." (Day 2 Tr., 11:12-13.)  What the Court saw and heard after Ms. Hsu's testimony resumed was her admission that she never shared with the government any details about any challenges with the purportedly "preferred" factory Eli (Yilai) (Day 2 Tr., 21:14-18), and her astounding assertion that Derrick Chang, with whom she and Tim Thorpe settled in the civil case in June 2020 and who was on deck to testify for the government after her, had perjured himself in the declaration he provided to HCT as a condition of settlement.  (Day 2 Tr., 28:14-29:18.)  On redirect, she repeated her previous

5

falsehood that it was the investment banker, Houlihan Lokey, rather than her or someone at HCT, who defined what a "controlled" supplier was in Project Allure. (Day 1 Tr., 60:2-61:1; Day 2 Tr., 32:11-33:2.) Neither she nor the government asked themselves why Houlihan Lokey would put quotes around the term ("controlled" supplier) if it was someone at Houlihan Lokey who defined the term. (Day 2 Tr., 32:11-33:2; *see* Ex. 105, at 54.) In short, Ms. Hsu began January 12, 2023 lacking credibility, and by the end of the day, led the government over the credibility cliff.

The fourth person who could speak to whether Mr. Gardner's conduct was ratified or known at HCT is the absent Mr. Tim Thorpe. The question posed by the Court, "where's Mr. Thorpe?", remains unanswered. (Day 2 Tr., 6:21-23.) Why didn't the former CEO of HCT appear as a witness even though he lives in Santa Monica? (Day 1 Tr., 25:12-13.)

The government's response to this question was that Mr. Thorpe did not "have the same sort of insight into the day-to-day sales" as Ms. Hsu. (Day 2 Tr., 6:21-7:9.) But this case is not about the day-to-day sales of HCT; it is about the existence and viability of company policies, company culture, and company approval of side income, all topics that should fall within the direct purview of the CEO of a family-owned business, the son of the founder and former CEO, and Nicholas Gardner's former close friend. However, given the impeachment material concerning Tim Thorpe that Mr. Gardner had shared with the government and the Court, including the obvious, protracted lies about his knowledge of JC Packaging (which Derrick Chang also shared, *see* Infra III.E), it is not surprising that the government effectively removed him from its case and relied on Ms. Hsu to take his place.

Even without testimony from Chris and Tim Thorpe, there is plenty of corroborating information from third parties to demonstrate the culture of side income that permeated HCT and was promoted by Tim and Chris Thorpe. This is not just a matter of he-said, he-said. Rather, as introduced at the hearing, testimony from Amy Zunzunegui (employee of one of HCT's largest customers, Urban Decay) and Scott

6

Desson (a former HCT engineer) also chronicles the Thorpe family's attitude toward and use of foreign bank accounts, their appreciation of side payments, and impeachment evidence relating to Tim Thorpe.

Specifically, in Mr. Desson's declaration, he described in detail how Chris Thorpe taught him to create foreign holding companies to hide money in other countries. *See* Ex. 117, at 2-3 ("Chris said, 'I'll show you how to hide money.'. . . Chris said it was easy to set up foreign holding companies. He said that Switzerland and the Cayman Islands were the best places to hide money. He suggested that I set up my own foreign holding company, which no one would need to know about."). In a similar vein, Ms. Zunzunegui, in her civil deposition, testified that Tim Thorpe told her that he would set up a Hong Kong bank account for her and send her money. *See* Ex. 118 at 20 ("[Tim] said he wanted to set up an account in Hong Kong for me, and then he would put money into it and then I could withdraw the money in the U.S. from an ATM for anything that I needed… It was kind of a thank you for giving us so much business."). This evidence demonstrates that Tim and Chris Thorpe themselves operated freely in a side income, foreign bank account marketplace.

Separately, as a factual matter, it is undisputed that HCT employees were allowed to have financial interests in HCT suppliers as long as it was known or consented to by the Thorpe family. Ms. Hsu acknowledged that Abraham Li had an interest in Yilai and that members of the Thorpe family had interests in other HCT suppliers. *See* Day 2 Tr., 27:6-19; *see also* Ex. 104, at 48 (citing Project Allure, Management Presentation, Dec. 2016 listing "Related-Party" suppliers owned by Thorpe family members). The government has never produced any evidence that HCT formally consented to these interests, e.g., in writing. Instead, Ms. Hsu merely said casually that such interests were "[d]isclosed and authorized, absolutely. I mean, they – I guess they are disclosing it to themselves as owners of HCT." (Day 2 Tr., 27:20-22.) HCT's own culture of approval and participation in outside business interests is further proof that Mr. Gardner's outside business interests and side income

1   were known to HCT.

2          A few additional, and important, facts for the Court to consider include the fact

3   that Mr. Gardner received the employee handbook stating that outside income was not

4   permitted multiple times after February 2010 (and after the alleged scheme began) but

5   never signed it again.  In fact, he told the government during his proffer that he openly

6   did not sign the employee agreement and told Human Resources he would not be

7   signing the handbook because he had outside business interests.  *See* Government Ex.

8   18, at 15-16.

9          In addition, Mr. Chang testified that Mr. Gardner had told him more than once

10  that the Thorpes were aware he had side interests and made side income.  (Day 2 Tr.,

11  75:17-24; 76:14-25.)  Mr. Chang also testified to the fact that Mr. Gardner had told

12  him that the Thorpes themselves had side income.  (Day 2 Tr., 76:19-23.)  Mr. Chang

13  and Mr. Gardner were not identically situated in the sense that Mr. Gardner, as a de

14  facto member of the Thorpe family, had a direct line of communication with the

15  Thorpes about the pursuit of outside business interest.  (Day 2 Tr., 75:22-77:4).  Mr.

16  Chang did not.  Mr. Chang also mentioned that Mr. Gardner was nonchalant about

17  having a special items ledger on the HCT server and printing it at the office, indicating

18  that there was nothing secretive about the income.  (Day 2 Tr., 74:6-16; 75:17-21.)

19  Moreover, as discussed below, the evidence shows that HCT's revenues and profits—

20  and Tim Thorpe's income—grew dramatically during this period, which helps explain

21  why HCT and the Thorpes would have no objection to Mr. Gardner's side income.  In

22  sum, no one in a position to know has credibly disputed that Mr. Gardner's side

23  income was known to the Thorpes and, accordingly, HCT.[2]

24

25  [2] The government has never interviewed anyone in HCT's Human Resources

26  Department to corroborate what Mr. Gardner told the government during his proffer:
    that he openly did not sign the employee agreement and told Human Resources he

27  would not be signing the handbook because he had outside business interests.  *See*

28  Government Ex. 18, at 15-16.

8

**B.    The Government has not Demonstrated an Intent to Defraud HCT.**

The government and Mr. Gardner agree that honest services fraud requires specific intent to defraud.  *See* Government Mem. at 20 (citing *United States v. Kincaid-Chauncey*, 556 F.3d 923, 942 (9th Cir. 2009)).  However, the government has not proven, by any standard, that Mr. Gardner had any intent to defraud HCT.  Rather, it has made blanket statements in both Mr. Gardner's and Mr. Chang's Information that Mr. Gardner and Mr. Chang acted in their self-interest "[i]nstead of selecting manufacturers based on criteria that would advance HCT's interests."  Exs. 112, 113.  To the contrary, Mr. Gardner has demonstrated that his interests were aligned with those of HCT's and that he acted with the mindset of improving HCT's, and the Thorpe family's, profits.  *See U.S. v. Brown*, 459 F.3d 509, 522 (5th Cir. 2006) (finding conduct beyond the scope of honest services fraud where the employees' conduct was aligned with the company's stated interests).

As the Court recognized during the evidentiary hearing, the government's financial harm story does not add up.  First, Jenny Hsu presented the loss as "lost profits," but then "when she's shown the documents, which is essentially public offering documents which the heck should be true showing massive profits… the testimony changes to, well, we would have made more money."  (Day 2 Tr., 4:16-23.)  Through these functionally public offering documents prepared by Houlihan Loukey, which the Court correctly observed are presumptively reliable in reporting the company's finances (Day 2 Tr., 8:2-11), Mr. Gardner has shown that HCT's revenue and profits grew dramatically during the years of the alleged scheme.  *See generally*, Ex. 105 ("Project Allure" presentation).

For example, the Project Allure documents show that "from FY15 to FY16 alone, adjusted net sales and EBITDA increased by $106.6 million and $24.1 million, or 50.7% and 136.3%," respectively.  *See* Ex. 103, at 9 (citing information from Ex. 105, at 27).  The increase was primarily due to net sales growth (mainly Urban Decay, Too Faced, and Kendo), i.e., Mr. Gardner and Mr. Chang's accounts.  *See* Ex. 105, at

9

27.  Likewise, from FY 2010 through the last twelve months ending September 2016, net sales increased from $74 million to $353 million: a 477% increase.  *See* Ex. 104, at 7.  During these growth years, Tim Thorpe's compensation also increased exponentially.  *See* Ex. 104, at 18-19.  As noted by Houlihan Loukey in Project Allure, "the increase from FY15 and FY16 [of salaries and wages expenses] was primarily driven by 'excess' compensation paid to the Company's CEO, Mr. Tim Thorpe."  *See* Ex. 105, at 48.  It is abundantly clear that there was no intention to harm HCT during the years in question.  In fact, there was only exponential economic gain and no harm at all from the actions of Mr. Gardner.

Second, besides the financial evidence that speaks for itself, no testimony is more telling of the fact that neither Mr. Gardner nor Mr. Chang meant HCT any harm, nor caused HCT any harm, than Mr. Chang's own testimony.

> *Q: When you selected manufacturers for your clients while you were*
> *employed at HCT, did you select manufacturers to advance the interests*
> *of your customers?*
> *A: That is correct, sir.*
> *Q: And did you select manufacturers that you believed would advance*
> *the interest of HCT?*
> *A: By proxy, yes.*
> *Q: Did you use JC Packaging to advance the interest of HCT?*
> *A: Advance the interest of my clients and, because interest were aligned,*
> *HCT as well.*
> *Q: So your clients win because –*
> *A: Better products –*
> *Q: – a really good manufacturer was involved. And HCT wins because it*
> *keeps that customer and it makes money.*
> *A: Yes, sir.*
> *Q: Was the same true of Fortune?*

1    *A: Yes, sir.*

2    (Day 2 Tr., 65:25-66:16.)

3    Mr. Gardner, with the help of Mr. Chang, worked tirelessly for the good of

4  HCT.  He achieved great success for the company over the years.  He did not intend to

5  defraud HCT, and the government has not met its burden of satisfying this element.

6    **C.    The Government has not Demonstrated that the Payments Made to**

7          **Mr. Gardner Were Kickbacks.**

8    In terms of kickbacks, Mr. Gardner does not dispute that in *Skilling v. United*

9  *States*, the Supreme Court defined "kickback" to mean "any money, fee, commission,

10  credit, gift, gratuity, thing of value, or compensation of any kind which is provided,

11  directly or indirectly, to [enumerated persons] for the purpose of improperly obtaining

12  or rewarding favorable treatment in connection with [enumerated circumstances]."

13  561 U.S. 358, 412-413 (2010).  The transfer of money between Mr. Shi and Mr.

14  Gardner and Mr. Chang is also not disputed.  However, and importantly, the payment

15  described in the kickback definition is for the **purpose of improperly obtaining or**

16  **rewarding favorable treatment**.  Accordingly, the government must allege and prove

17  a quid pro quo in order to establish a violation of the honest services fraud statute

18  based on an alleged kickback.  The government has failed to meet this burden.

19    Here, the government's arguments are based on conjecture.  As the government

20  stated in the hearing, "it *doesn't seem* that if it were purely out of the goodness of his

21  heart and he had no economic purpose whatsoever other than to foster a positive

22  relationship," Mr. Shi would pay the Defendants.  (Day 2 Tr., 118:11-15) (emphasis

23  added).  The government continued, again based on speculation, that "[Mr. Shi] wants

24  to make sure they continue to send business his way."  *Id*. at 118:17-18.

25    Mr. Gardner's motivation is a fundamental aspect of the case and one that

26  remains completely unproven.  First, there is no evidence that Mr. Gardner and Mr.

27  Chang were receiving money that should have gone to HCT.  Mr. Chang testified:

28

1      *Q: And you were told by Michael Shi that that side income represented*

2      *profits from Fortune, right?*

3      *A: Yes, sir.*

4      *Q: Not profits taken away from HCT, correct?*

5      *A: Yes, sir.*

6      (Day 2 Tr., 67:6-10.)

7      While Mr. Chang testified that Mr. Shi sent money as a thank-you for the

8 business, he also stressed that there was no exchange or favorable treatment (*see*

9 *Skilling*, 561 U.S. at 412-413) provided to Mr. Shi because of the payments:

10      *Q: Is it true – it is a fact that there came a point in time that you began*

11      *receiving side income from Fortune, true?*

12      *A: Yes, sir.*

13      *Q: Before that point in time you had used Fortune, right?*

14      *A: Yes, sir.*

15      *Q: And you had used Fortune because you thought Fortune was a terrific*

16      *option for your customers.*

17      *A: Yes, sir.*

18      *Q: And then you began receiving side income, right?*

19      *A: Yes, sir.*

20      *...*

21      *Q: Was there ever a time that you placed an order with Fortune for the*

22      *purpose of getting money?*

23      *A: No, sir. If I could elaborate, it was, again, for the advancement of*

24      *growing business with our clients and to everyone's mutual benefit.*

25      *Q: All right. Yeah, so I'll break it into pieces.*

26      *A: Okay.*

27      *Q: I'm referring [to] Kendo, for example, to Fortune. Was that because it*

28      *was the best option for Kendo?*

*A: Yes.*

*A: In my opinion.*

*Q: And it was also going to reap profits for HCT.*

*A: Yes, sir.*

(Day 2 Tr., 66:21-67:5;67:11-24.)

As even more proof that there was no quid pro quo here, there is direct evidence from the relevant time period that Michael Shi and Fortune had capacity to accept more HCT orders but did not.  Internal HCT emails confirm Fortune did not "want to put all eggs into one basket only…HCT business has already occupied over 35% from their total business. It is risk management on his business."  *See* Ex. 110, at 1.  Why would a co-conspirator who is, according to the government, exchanging money for favorable treatment, refuse more business from that same company?

Mr. Chang further testified that in securing the services of Fortune and JC Packaging to manufacture or source the manufacture of several of HCT's products, he was focused solely on client satisfaction.  Contrary to Jenny Hsu's false narrative, Fortune not only was not a rogue manufacturer, but was in fact known to and respected by Tim Thorpe and Jenny Hsu themselves. Specifically, Mr. Chang testified:

> *Q: There were you mentioned the preferred factories and you mentioned*
> *reasons why Kent or Eli might not be the right choice; do you remember*
> *that?*
> *A: Yes, sir.*
> *Q: Was there ever a time that you believed Eli was better for your*
> *customers than JC Packaging?*
> *A: Never, sir.*
> *Q: Was there ever a time that you believed Eli or Kent were better for*
> *your clients than Fortune?*
> *A: The only time was when Ms. Liao was still running the project*

13

*management team at HCT-Kent. Then I would have said the performance*
*of – you know, her presence made sure that business was running*
*smoothly. But after her departure everything went pretty significantly*
*downhill.*

*Q: So there was a time that you would source work at Kent without*
*hesitation and believe it was in the best interest of your customer.*

*A: Yes, sir.*

(Day 2 Tr., 67:25-68:17.)

Besides Mr. Chang's testimony, numerous independent emails and documents demonstrate that Fortune was, in fact, a preferred supplier in every way, and that it was in the best interest of HCT's customers for their work to be produced at Fortune. First and foremost, HCT's own Project Allure documents list Fortune/Robust as the number-one supplier to HCT and admit that Fortune/Robust is considered an HCT "controlled" third party. *See* Ex. 105, at 54.  In addition, the use of Fortune was actually mandated by one of HCT's, and Mr. Gardner's, largest customers, Urban Decay.  *See, e.g.*, Ex. 107, ¶ 7 ("…Urban Decay preferred Fortune Plastic Packaging for certain manufacturing because Fortune had a shorter lead-time for tooling than certain other manufactures and Fortune had experience with compacts in tin material."); Ex. 118, at 14-15 (citing civil deposition of Amy Zunzunegui) (Q: "you state in your statement here that . . . you made it clear to Nick and HCT team, as well as to Tim Thorpe, that all future lipstick orders needed to be run at Fortune. . . . Why did you make that clear . . . ?" A: "It was due to the quality… as I recall, their delivery was better, everything. And so we said going forward, we wanted them to run all the lipsticks for consistency.").  Customer Kendo also preferred Fortune.  *See* Ex. 107, ¶ 8 ("Kendo [had the] following preferences regarding Fortune Plastic Packaging . . . Fortune had a shorter lead-time for tooling than certain other manufacturers and Fortune had experience with compacts in tin material.").  Fortune also was used as a subcontractor by HCT's other "preferred" factories, such as Yilai.  (Day 2 Tr., 49:2-6)

14

1   ("They were running molds that…were actually from Eli (Yilai). So apparently Eli

2   (Yilai) was already sending overflow business to them that I wasn't aware of. From

3   that perspective, we assumed that their quality of execution was sufficient.").  Fortune

4   was even preferred by Jenny Hsu and Tim Thorpe themselves.  For example, in an

5   email chain from June 2012, Tim Thorpe mandated that the group "try to use Robust

6   as often as possible until [the issue at Yilai] is resolved… I'm advising Jenny to

7   proceed with Robust (given they can meet our price target)."  Ex. 109, at 2.

8        These issues with capacity and quality at the "preferred" HCT factories, Yilai

9   and Kent, are well-documented.  In a 2013 email to Jenny Hsu, an employee at HCT

10  Asia said, "we really almost stop to open new project at HCT [Kent]… He is an

11  emotional child and always makes some unexpected trouble for us that you and me

12  fully understand his character."  Ex. 108, at 1.  HCT's own trade secret disclosure

13  statement in the civil case admitted that Kent had serious quality and capacity issues

14  during this time frame.  Ex. 107, ¶ 10.  In 2014, Tim Thorpe himself complained that

15  "[i]n regards to Yilai, there are more internal complaints by HCT staff that Yilai's

16  response time is slow, drawings are slow, technical backup is slow, there have been

17  quality issues etc… There is certainly a feeling at both offices that any additional

18  business given to Yilai could cause them to collapse further."  Ex. 110, at 2.  In

19  November 2015, Adrian Apodaca, HCT's head of engineering, complained that the

20  quality and consistent output of products out of Yilai had declined sharply and Yilai

21  quality control had become complacent, reactive, and not proactive, and perhaps non-

22  existent at times, among other complaints.  Ex. 111, at 6.

23       This evidence demonstrates that Mr. Chang and Mr. Gardner would have sent

24  the business to Fortune with or without the payments from Mr. Shi's profits.  There

25  was no exchange for the purpose of improperly obtaining or rewarding favorable

26  treatment.  The government has made broad claims of kickbacks but has not provided

27  any evidence more plausible than the fact that Mr. Gardner did business with Fortune

28  because it was the best supplier for HCT and its customers.  The government's own

cooperating witness repeatedly swore as much.  The government has utterly failed to investigate this point as evidenced by its failure to interview the CFO and other key employees of HCT; to conduct follow-up interviews with Mr. Thorpe, Ms. Hsu, and other witnesses regarding exculpatory facts presented to them by Mr. Gardner's counsel; to interview a single HCT customer; or to interview (or even try to interview) a single supplier, not even Michael Shi and Angela Liao.

### D. Burden of Proof

The government has suggested, twice in its pre-hearing briefing and then again during the evidentiary hearing, that the Court's decision as to the proper burden of proof is academic since the government will meet any burden the Court imposes.  *See* Government Mem. 14:1-3; 16:9-12 (Dkt. No. 31); (Day 2 Tr., 7:15-22).  Yet, at the same time, it proposes a lower burden of proof (preponderance) and ignores the unique circumstances of this case.

As noted in Mr. Gardner's pre-hearing briefing, by seeking a lower burden, the government is asking for the same burden of proof governing *civil* lawyers *in non-fraud cases*. *See, e.g., OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc.*, 897 F.3d 1008, 1020 (9th Cir. 2018) (setting the burden of proof in federal civil fraud cases as clear and convincing evidence).  Mr. Gardner urges the court to apply the exception to the general rule that the preponderance standard governs sentencing enhancements because here there is "an extremely disproportionate effect on the sentence relative to the offense of conviction."  *See United States v. Hymas*, 780 F.3d 1285, 1290 (9th Cir. 2015) (citation and quotations omitted).  The inquiry is "fact-specific and defendant-specific, as revealed by cases in which we have applied different evidentiary standards to co-defendants in the same proceeding." *United States v. Gutierrez*, 843 F. App'x 60, 64 (9th Cir. 2021) (unpublished).

Courts consider the following six factors: "(1) whether the enhanced sentence falls within the maximum sentence for the crime alleged in the indictment; (2) whether the enhanced sentence negates the presumption of innocence or the

prosecution's burden of proof for the crime alleged in the indictment; (3) whether the facts offered in support of the enhancement create new offenses requiring separate punishment; (4) whether the increase in sentence is based on the extent of a conspiracy; (5) whether an increase in the number of offense levels is less than or equal to four; and (6) whether the length of the enhanced sentence more than doubles the length of the sentence authorized by the initial sentencing guideline range in a case where the defendant would otherwise have received a relatively short sentence." *Hymas*, 780 F.3d at 1290.  Here, the Court should consider, among other relevant circumstances, factor (3) – whether the facts offered in support of the enhancement create new offenses requiring separate punishment – because Mr. Gardner's count of conviction for failure to report of a foreign bank account has no relation to the government's desired enhancements based on honest services fraud.  In addition, the Court should consider factor (2) – whether the enhanced sentence negates the presumption of innocence or the government's burden of proof for the crime alleged – because Mr. Gardner has specifically entered a not guilty plea to Count One of the Information for honest services fraud.  By seeking sentencing enhancements based upon Count One, Mr. Gardner's presumption of innocence is clearly threatened.

As a matter of both law and principle, the Court should require the government to prove by clear and convincing evidence that Mr. Gardner was engaged in a conspiracy to commit honest services fraud. However, even with the lower standard, the government has failed to meet its burden.

### E.    The Government has Failed in its Investigation, Leading to its Failure of Proof.

As Mr. Gardner's counsel predicted at the outset of January's hearing, the evidence presented at the hearing revealed a failure of proof and a failure of investigation.  (Day 1 Tr., 6:1-2.)  Based on nothing more than Ms. Hsu's deceptive slide presentation, the government opened an investigation that has extended almost four years yet generated minimal actual investigating.  Mr. Gardner's team tried,

1    through its 2019 presentation (Ex. 103) and its two 2021 presentations (Ex. 104, 118),

2    to inspire the government to investigate the falsehoods told to it by Jenny Hsu and

3    Tim Thorpe and repeated in their civil depositions. The government was unmoved, to

4    the point where it never interviewed Amy Zunzunegui or Scott Desson, nor did it

5    follow up with Ms. Hsu or Mr. Thorpe after receiving the contradictory evidence Mr.

6    Gardner's team provided. As the Court witnessed, the result was an evidentiary

7    submission that was a study in cognitive dissonance, with the subject of JC Packaging

8    center stage.

9        JC Packaging was one of the supposedly rogue manufacturers Ms. Hsu

10    identified in her 2019 presentation to the government. In his one and only interview

11    with the government, on April 3, 2020, Tim Thorpe lied about when he learned that

12    Angela Liao had formed a trading company, as the government's cooperating witness

13    Derrick Chang testified at the January hearing. (Day 2 Tr., 72-73.) Tim Thorpe's lies

14    led to the government writing an Information in *United States v. Chang* accusing Mr.

15    Chang, among other things, of accepting kickback payments from JC Packaging

16    which, the government wrote, was posing as a manufacturer. *See* Ex. 113, at 3:13-16.

17    The government included the same "facts" in the factual basis portion of the plea

18    agreement it required Mr. Chang to sign in June 2020. *See* Ex. 119, at 13. But in the

19    same month, Chang swore in a declaration that JC Packaging did not pay any

20    kickbacks. *See* Ex. 120, at 14, ¶ 12. And, in an interview with the government, Mr.

21    Chang stated that it was known to HCT that JC Packaging was a sourcing company.

22    *See* Ex. 114, at 6, ¶¶ 32-36. For her part, Jenny Hsu swore at the January 2023

23    hearing that she "think[s] he (Chang) received money in some way" and "lied" about

24    whether he received kickbacks from JC Packaging. (Day 2 Tr., 28:14-29:18.) To

25    summarize, government witness number one, Ms. Hsu, thinks government witness

26    number two, Mr. Chang, remains a liar. For his part, Mr. Chang implicitly believes

27    Ms. Hsu's testimony is not credible, and expressly called out the noticeably absent

28    Tim Thorpe's lies. That defines cognitive dissonance and highlights the government's

1     failure of proof.

2          The third and final government witness was FBI Agent Cherney.  Recall that

3     his FBI colleagues, in February 2017, concluded, "[t]he allegations against Gardner

4     appear to be a breach of his employment contract rather than a criminal violation

5     pending additional findings."  *See* Ex. 101.  Three years later, and more than a year

6     after the 2019 Hsu/Thorpe deceptive referral and the Gardner/Chang legal team's

7     response (which Chang confirmed in his January testimony was accurate), the FBI's

8     "findings" were that Ms. Hsu and Mr. Thorpe were credible and that almost zero

9     further investigation was required.  The investigative derelictions were multiple:

10    neither Agent Cherney or any member of his team even attempted to reach out to

11    Michael Shi or Angela Liao, the alleged co-conspirators in this case, to determine if

12    they would consent to interviews (Day 2 Tr., 99:6-25); Agent Cherney failed to

13    interview anyone in HCT's Human Resources Department to investigate whether Mr.

14    Gardner told Human Resources he would not be signing the employee handbook

15    because he had outside business interests (Day 2 Tr., 109:13-110:5); and neither

16    Agent Cherney nor any other government actor appears to have noticed the disconnect

17    between Mr. Chang's Information and plea agreement and the declaration he signed as

18    part of his civil settlement agreement and his initial interview with the government

19    about JC Packaging.  (Day 2 Tr., 100:1-21.)

20         What's more, Agent Cherney did not speak to any HCT employees about

21    comparative quality and pricing between Fortune, Yilai, and Kent.  (Day 2 Tr.,

22    100:17-101:11.)   Agent Cherney did not even remember if he saw the 2021 defense

23    presentation containing deposition excerpts from Amy Zunzunegui (Ex. 118) that

24    included allegations that Tim Thorpe offered her side income.  He did remember that

25    he did not interview her or any of HCT's other largest customers.  (Day 2 Tr., 102:10-

26    23.)  And he failed to interview Scott Desson, whose declaration detailed Chris

27    Thorpe's guidance about how to hide side income.  *See* Ex. 117, at 2-3.  These are just

28    examples of the government's failure of investigation.  And the government's failure

of investigation led inexorably to its failure of proof.

## IV.    Conclusion

The government team consists of good people and good professionals.  But as the foregoing pages make clear, something went wrong here.  HCT, in the persons of Ms. Hsu and Mr. Thorpe, deserves neither sympathy nor restitution.  The government discovered too late that it had a bad victim witness, and an even less credible former chief executive whom they couldn't even present to the Court.  Given the poor quality of the HCT evidence and the lack of basic, fundamental investigation, the government has not earned the two enhancements it seeks.  For these reasons and those set forth above, Mr. Gardner urges the Court to find that the government has not met its burden, under any standard, to support adding those enhancements and that the matter can proceed without them through the pre-sentence process.


Dated:  March 3, 2023                    WINSTON & STRAWN LLP


                                         By:    /s/ David C. Scheper
                                                David C. Scheper
                                                Lara Markarian

                                                Attorneys for Defendant
                                                NICHOLAS GARDNER

DEFENDANT'S CLOSING BRIEF RE EVIDENTIARY HEARING