E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
ALEXANDER B. SCHWAB (Cal. Bar No. 283421)
Assistant United States Attorney
Deputy Chief, Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-1259
     Facsimile: (213) 894-0141
     E-mail:    alexander.schwab@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 22-147-PSG |
|---|---|
| Plaintiff, | GOVERNMENT'S CLOSING BRIEF REGARDING EVIDENTIARY HEARING |
| v. | Hearing Date: March 22, 2023 |
| NICHOLAS GARDNER, | Hearing Time: 9:00 a.m. |
| Defendant. | Location:    Courtroom of the Hon. Philip S. Gutierrez |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of

//
//

California and Assistant United States Attorney Alexander B. Schwab, hereby files closing brief regarding the evidentiary hearing in this matter.

Dated: March 3, 2023                    Respectfully submitted,

                                        E. MARTIN ESTRADA
                                        United States Attorney

                                        MACK E. JENKINS
                                        Assistant United States Attorney
                                        Chief, Criminal Division


                                        _____/s/_____
                                        ALEXANDER B. SCHWAB
                                        Assistant United States Attorney

                                        Attorneys for Plaintiff
                                        UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

**PAGE**

I.   INTRODUCTION..................................................1

II.  FACTUAL AND PROCEDURAL BACKGROUND..............................3

III. ARGUMENT......................................................4

    A.   Aside from Being Facially Implausible, It Is Not a Defense for Defendant To Assert That Robust/Fortune's Payment of Kickbacks Did Not Influence His Decision to Send It HCT's Business.....................................6

        1.   Because § 1346 Criminalizes Schemes To Deprive Victims of the Intangible Right of Honest Services, No Tangible Effect on the Victim's Business Is Needed....................................6

        2.   The Kickbacks That Robust/Fortune Paid Defendant and Chang Were Kickbacks............................8

        3.   To Be Material, Defendant's Kickback Scheme Need Only Have Been Capable of Leading a Reasonable Employer To Change Its Conduct......................9

    B.   While It Is No Defense for an Executive Receiving Kickbacks To Claim That Others Knew of His Scheme, Defendant's Habitual Dishonesty Put the Lie to His Outrageous Claim That His Behavior Was Condoned at HCT...11

        1.   The Evidence Contradicts Defendant's Claim That He Informed Members of the Thorpe Family of the Millions of Dollars Robust/Fortune Paid Him.........11

        2.   Even Defendant's Claims Are Insufficient To Show He Acted Without Intent To Defraud..................15

IV.  CONCLUSION...................................................16

**TABLE OF AUTHORITIES**

**PAGE(S)**

Other Authorities

Skilling v. United States,
  561 U.S. 358 (2010) ........................................... 1, 8
United States v. Gross,
  370 F. Supp. 3d 1139 (C.D. Cal. 2019) ............................ 10
United States v. Hernandez,
  No. 20-50012, 2021 WL 3579386 (9th Cir. Aug. 13, 2021) ........... 12
United States v. Miller,
  953 F.3d 1095 (9th Cir. 2020) .................................... 11
United States v. Milovanovic,
  678 F.3d 713 (9th Cir. 2012) .................................... 6, 9
United States v. Nayak,
  769 F.3d 978 (7th Cir. 2014) ...................................... 7
United States v. Rybicki,
  354 F.3d 124 (2d Cir. 2003) ...................................... 11
United States v. Wallach,
  935 F.2d 445 (2d Cir. 1991) ...................................... 15

**Statutes**

18 U.S.C. § 1346................................................passim

**Sentencing Guidelines**

USSG § 2S1.3.............................................. 3, 4, 16

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.  INTRODUCTION**

The honest services fraud statute punishes "offenders who, in violation of a fiduciary duty, participate[] in bribery or kickback schemes." Skilling v. United States, 561 U.S. 358, 407 (2010). Defendant orchestrated an archetypal honest services fraud scheme. In spite of his fiduciary duty to his employer HCT, defendant accepted millions of dollars in kickbacks from an HCT supplier who rewarded him and Derrick Chang on a per-order basis.  He did not merely conceal millions of dollars in foreign income from the IRS.

Defendant disputes his guilt through a variety of claims that are legally erroneous and factually spurious.  Acknowledging, as he must, that he received millions of dollars in payments from Robust/Fortune,[1] he argues that he is nevertheless innocent of honest services fraud because (1) the kickbacks were irrelevant to his decision to direct HCT's business to that supplier, and (2) his "side payments" were known to select individuals within HCT.  Both these claims are inconsistent with the evidence, and they fail as a matter of law.

In regard to the first argument, honest services fraud requires no evidence that defendant caused or intended to cause HCT actual harm.  Though defendant did, in fact, cause HCT pecuniary harm, the plain language of 18 U.S.C. § 1346 requires only a showing of a scheme to deprive HCT of its intangible right to defendant's honest services.  The defense similarly misapprehends the materiality requirement of honest services fraud in two respects.  First, a

---

[1] The government uses the term "Robust/Fortune" to refer to the HCT supplier, as its name changed during the relevant timeframe.

1

defendant's failure to disclose the acceptance of kickbacks is material if it is capable of influencing a reasonable employer's actions; it is not a factual inquiry into whether a specific employer was influenced.  Second, the relevant question is not whether the kickbacks were capable of influencing defendant's decisionmaking, but whether they were capable of influencing HCT's.  Even if defendant implausibly believed, in his heart of hearts, that $5.6 million in kickbacks made no difference to the work he funneled to Robust/Fortune, disclosure of that fact undoubtedly was capable of influencing HCT or any other reasonable employer.  Indeed, once HCT began to suspect defendant of self-dealing, it investigated him, terminated him, sued him, and eventually referred him for prosecution.

In regard to the second argument, no evidence supports defendant's extraordinary claim that, in accepting "side payments" from Robust/Fortune, he had the blessings of HCT's owner and its CEO. That claim is inconsistent with HCT's policies, inconsistent with the testimony of defendant's co-conspirator, inconsistent with his own lies and attempts to conceal his scheme, and inconsistent with common sense.  But it fails as a matter of law as well.  A supervisor's knowledge of a subordinate's kickback scheme may render him complicit in the scheme, but it does not exonerate the subordinate.  And even according to defendant's implausible story, he did not disclose to HCT's owner the fact that he accepted $5.6 million in kickback payments from Robust/Fortune, but rather that he was receiving "outside income" -- a material distinction.

Accordingly, defendant's failure to report his foreign bank accounts gives rise to enhancements under USSG §§ 2S1.3(b)(1)(A) and 2S1.3(b)(2) because the unreported funds in defendant's foreign account were derived from criminal activity and arose from a pattern of illegal activity involving more than $100,000 in a 12-month period -- namely, the honest services wire fraud scheme charged in count one of the information.

**II.   FACTUAL AND PROCEDURAL BACKGROUND**

The government's pre-hearing brief set forth at length the facts of this case. In short, defendant is a former executive of HCT, a cosmetics company that contracts with various suppliers to fulfill work orders that it sells to major cosmetics brands. Along with his direct subordinate Derrick Chang, defendant began receiving regular payments from Robust/Fortune, one of HCT's suppliers, corresponding to specific work orders defendant and Chang had directed from HCT to Robust/Fortune. Both defendant and Chang received those payments in bank accounts that they opened at the same branch in Hong Kong on the same day. Both had saved, on their HCT-supplied digital devices, a version of a "special items" ledger, maintained by Robust/Fortune's owner, that documented the kickback payments they received and connected them to specific invoices pertaining to work done for HCT. Though defendant was aware of his obligation to report foreign income and bank accounts to the IRS and accurately reported other accounts, he intentionally concealed this account from the IRS until his termination from HCT in 2017.

Defendant pleaded guilty to failing to file a Report of Foreign Bank and Financial Accounts in connection with an information that

3

also charged him with conspiracy to commit honest services fraud.  At defendant's change of plea hearing, the Court agreed to set an evidentiary hearing to address the applicability of two enhancements under the Sentencing Guidelines: whether the unreported funds in defendant's account were derived from illegal activity, USSG § 2S1.3(b)(1)(A), and whether defendant committed his offense in connection with a pattern of illegal activity involving more than $100,000 in a 12-month period.

The government presented the testimony of three witnesses during the evidentiary hearing: Derrick Chang, defendant's co-conspirator who is cooperating with the government after pleading guilty to conspiracy to commit honest services fraud; Jenny Hsu, who provided background on HCT, introduced various documents, and summarized HCT's investigation of defendant and Chang; and FBI Special Agent Nathan Cherney, who introduced various additional records and summarized defendant's October 5, 2020, interview with law enforcement.

**III. ARGUMENT**

As set forth in the government's previously filed memorandum regarding the evidentiary hearing, the Ninth Circuit Model Jury Instructions set forth the following elements for honest services fraud:

First, defendant devised or knowingly participated in a scheme or plan to deprive HCT of its right of honest services;

Second, the scheme or plan consisted of a bribe or kickback in exchange for defendant's services.  The "exchange" may be express or may be implied from all the surrounding circumstances;

Third, defendant owed a fiduciary duty to HCT;

Fourth, defendant acted with the intent to defraud by depriving HCT of its right of honest services;

Fifth, defendant's act was material; that is, it had a natural tendency to influence, or was capable of influencing an entity's acts; and

Sixth, defendant used, or caused to be used, an interstate or foreign wire communication to carry out or attempt to carry out an essential part of the scheme.

See Manual of Model Criminal Jury Instructions for the District Courts of the Ninth Circuit, No. 15.34 (2022 ed.).

As far as the government is aware, defendant does not dispute that he owed a fiduciary duty to HCT or that the scheme involved foreign wire communications. He instead argues that the kickback scheme had no influence on his decision to direct HCT's business to Robust/Fortune. In doing so, he misapprehends the meaning of the "intangible right of honest services" under § 1346, what constitutes a "kickback" payment, and what the materiality requirement entails.

Defendant also contends that he told Chris Thorpe (HCT's owner) and Tim Thorpe (its CEO) of the payments he was receiving. While informing HCT's owner of the entirety of the kickback scheme might vitiate defendant's intent to defraud, the evidence squarely contradicts this claim. But even defendant makes no claim that he disclosed the amount of money he was receiving from Robust/Fortune or correctly described the payments as "kickbacks" -- a term he has consistently refused to use. Thus, even under defendant's false version of events, he concealed material information from HCT in a manner that still makes him guilty of honest services fraud.

**A.  Aside from Being Facially Implausible, It Is Not a Defense for Defendant To Assert That Robust/Fortune's Payment of Kickbacks Did Not Influence His Decision to Send It HCT's Business**

Defendant, a cosmetics company executive who directed supply contracts to factories paying millions of dollars in kickbacks, is no different from the city councilman who directs municipal business to a contractor who pays him under the table or the judge who accepts a bribe from a defendant looking for a lower sentence.  All might claim that they would have acted identically even absent the payment of kickbacks.  Or, like defendant, they might claim that the quality of their work more than makes up for the kickback scheme.  These are not cognizable defenses.

> 1. <u>Because § 1346 Criminalizes Schemes To Deprive Victims of the Intangible Right of Honest Services, No Tangible Effect on the Victim's Business Is Needed</u>

Defendant deprived HCT of its right to his honest services regardless of whether he intended all along to direct HCT's business to Robust/Fortune.  While he argued in his pre-hearing briefing that he "meant HCT no harm, and did HCT no harm" (CR 41, at 1), the plain language of § 1346 forecloses defendant's argument.  Honest services fraud involves not a fraudulent deprivation of money or property but "a scheme or artifice to deprive another of the intangible right of honest services."  18 U.S.C. § 1346.  For this reason, "there is no requirement in an honest services fraud case that economic loss be foreseeable."  <u>United States v. Milovanovic</u>, 678 F.3d 713, 726 (9th Cir. 2012).  Because "it is contradictory to require the government to show actual or intended <u>tangible</u> harm when the crime being prosecuted is defined as causing or intending to cause <u>intangible</u>

6

harm," there is no obligation to demonstrate, for example, some direct impact on HCT's business from defendant's kickback scheme. United States v. Nayak, 769 F.3d 978, 982 (7th Cir. 2014). Indeed, a scheme where the payment of kickbacks resulted in a measurable economic harm from the diversion of business would "mean that § 1346 is superfluous, as fraudulent schemes causing tangible harm are covered under" the ordinary theories of property fraud. Id.

Though economic harm is not an element of the offense, defendant's kickback scheme nonetheless resulted in such harm even if one accepts his assertion that, absent the kickback scheme, he would have directed the same amount of HCT's business to Robust/Fortune. HCT's actual losses would be equal, at the very least, to the value of the kickbacks themselves. The notion, suggested by the defense at the evidentiary hearing, that the kickbacks defendant received came out of Robust/Fortune's profits and not HCT's runs counter to basic logic and the fungibility of money: Robust/Fortune's willingness to pay millions of dollars in kickbacks demonstrated its willingness to accept a correspondingly reduced profit in exchange for HCT's business -- a benefit it could have passed along to HCT as savings in the form of lower, more competitive prices. If anything, Robust/Fortune's kickback payments cost it more money than offering HCT lower prices directly; in addition to the costs to Robust/Fortune of concealing the honest services fraud scheme, the kickbacks came from Robust/Fortune's post-tax earnings rather than reducing its pre-tax revenues.

If defendant had negotiated contracts with Robust/Fortune, overstated to HCT the agreed-on price, then skimmed a percentage of

the payment from HCT to Robust/Fortune, no one would question that defendant committed fraud.  Yet he did essentially the same thing here -- overstating, by omission of the kickback scheme, the lower price Robust/Fortune was willing to charge HCT for the work it had been awarded.  The honest services fraud statute encompasses precisely such conduct.

### 2. The Kickbacks That Robust/Fortune Paid Defendant and Chang Were Kickbacks

Skilling did not itself define the term "kickback," though it did quote the statutory definition of a "kickback" as "any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided, directly or indirectly, . . . for the purpose of improperly obtaining or rewarding favorable treatment."  561 U.S. at 412-413 (internal quotation marks omitted).

Chang testified that the owner of Robust/Fortune initially characterized the kickbacks by proposing "we'd like to send you some money as a thank-you for providing us this business and having this opportunity."  (Jan. 12, 2023, Tr. 49).  After defendant convinced Chang that they should acquiesce to the arrangement, they began receiving payments based on a "percentage of the business provided" to Robust/Fortune.  (Id. at 51).  The "special items" ledger, which Robust/Fortune provided defendant and Chang to track the kickback payments made, associated the payments with specific orders and invoice numbers.  (Id. at 54-55).  It is difficult to imagine an arrangement that more clearly qualifies as money provided "for the purpose of improperly obtaining or rewarding favorable treatment." And while the special items ledger and Chang's testimony at the

8

hearing demonstrate that the kickback scheme explicitly rewarded defendant and Chang for directing HCT's business to Robust/Fortune, the understanding "may be implied from all the surrounding circumstances." Manual of Model Criminal Jury Instructions for the District Courts of the Ninth Circuit, No. 15.34 (2022 ed.).

### 3. To Be Material, Defendant's Kickback Scheme Need Only Have Been Capable of Leading a Reasonable Employer To Change Its Conduct

Though there is no need to demonstrate an actual economic impact on HCT, it remains the case that "the misrepresentation or omission at issue for an 'honest services' fraud conviction must be 'material,' such that the misinformation or omission would naturally tend to lead or is capable of leading a reasonable employer to change its conduct." Milovanovic, 678 F.3d at 727 (internal quotation marks omitted).

During the hearing, the defense committed two category errors with respect to the materiality standard. First, the question of materiality is objective rather than subjective. We need not speculate on the precise action HCT would have taken had defendant's kickback scheme been brought to light, but whether "the misinformation or omission would naturally tend to lead or is capable of leading a reasonable employer to change its conduct." Id. (internal quotation marks omitted). Frankly, it is difficult to conceive a case in which it is not material for an executive to conceal from his employer the fact that he has accepted millions in kickbacks from a vendor; in such cases, "full disclosure of the kickback scheme would have alerted" the employer "of the possibility that Defendant was motivated by financial gain rather than by the

[employer's] best interest; in this manner, the omission is of the type that naturally tends to influence or, at the very least, is capable of leading a reasonable person to change his or her decision." United States v. Gross, 370 F. Supp. 3d 1139, 1147 (C.D. Cal. 2019). Defendant did not accept a complimentary donut from Robust/Fortune; he and Chang took millions of dollars in undisclosed kickbacks. This fact would be capable of leading any reasonable employer to change its conduct.

There is good reason why the materiality standard is objective: the very nature of honest services fraud offenses makes it impossible to verify defendant's claim that he would have made the same business decisions absent the kickback scheme. Defendant's kickback scheme perverted HCT's procurement process, depriving us of the ability after the fact to determine whether Robust/Fortune was or was not the best vendor for any given project -- that bell cannot be unrung. A defendant's unfalsifiable assertion that the kickbacks he was paid did not impact his decisionmaking cannot be sufficient to exonerate him of honest services fraud; otherwise, honest services fraud could never be proven. And while a healthy dose of skepticism should be applied to defendant's claim that the millions he collected in kickbacks did not influence his the choices he made, even if we could somehow say with confidence that he truly believes it, kickbacks can affect even internal logic in insidious ways.

Defendant's second error with respect to the materiality standard is even more damning. The question is whether knowledge of the kickback scheme was capable of influencing a reasonable employer's decisionmaking, making the actual influence of the

kickbacks on <u>defendant's</u> business decisions irrelevant. Again, the inquiry is objective, not subjective. But HCT's actions upon learning of the kickback scheme -- terminating defendant and eventually referring him for prosecution -- demonstrate that the fact of the kickback scheme was vitally important to HCT's business decisions.

Finally, although the materiality requirement does not require proof of economic harm to HCT, the fact that the kickbacks demonstrate Robust/Fortune's willingness to forgo increased profits to secure HCT's business is itself proof of materiality. <u>See</u> <u>United States v. Rybicki</u>, 354 F.3d 124, 146 (2d Cir. 2003) (en banc) ("Where it is reasonably foreseeable that the scheme could cause some [non-de minimis] economic or pecuniary harm to the victim, . . . the victim's knowledge of the scheme would tend to cause the victim to change his or her behavior." (internal quotation marks omitted)).

**B.   While It Is No Defense for an Executive Receiving Kickbacks To Claim That Others Knew of His Scheme, Defendant's Habitual Dishonesty Put the Lie to His Outrageous Claim That His Behavior Was Condoned at HCT**

1.   <u>The Evidence Contradicts Defendant's Claim That He Informed Members of the Thorpe Family of the Millions of Dollars Robust/Fortune Paid Him</u>

Defendant has supplied no evidence to back his fantastical claim that he lacked the requisite intent to defraud because the Thorpe family was aware of payments he received from Robust/Fortune and approved of it. While honest services fraud must involve an intent to defraud, that "intent to defraud" is not identical to the standard applicable to so-called property fraud offenses, where it involves an intent to "deceive <u>and</u> cheat." <u>United States v. Miller</u>, 953 F.3d

11

1095, 1098 (9th Cir. 2020). Honest services fraud still requires deception, but instead of depriving the victim of money or property, such a scheme deprives the victim of a right to honest services. United States v. Hernandez, No. 20-50012, 2021 WL 3579386, at *1 (9th Cir. Aug. 13, 2021) (unpublished). Concealment of the kickback scheme is all that is needed to establish fraudulent intent.

The evidence is very clear that defendant received no approval to accept millions of dollars in kickbacks from HCT vendors. As both Chang (an insider to the scheme) and Hsu (who spearheaded HCT's investigation) testified, no one else at HCT was aware of the kickback scheme. Defendant, by contrast, provides zero corroboration for his outrageous claim that the payments were known to both Chris Thorpe -- who was already deceased the first time defendant claimed to have informed him -- and Tim Thorpe, HCT's former CEO, who has consistently stated that he was unaware of the scheme.

Nor was there any ambiguity as to HCT's position on kickbacks. HCT's official policy prohibited employees from engaging in a wide array of conduct with HCT suppliers. The 2010 employee handbook reads:

> Unless approved in advance by executive management, you may not be a supplier to the corporation [HCT], represent a supplier to the corporation, work for a supplier to the corporation or be a member of its board of directors while you are an employee of the corporation. In addition, you may not accept money or benefits of any kind for any advice or services you may provide to a supplier in connection with its business with the corporation.

(Exh. 1, at 12). Defendant acknowledged in writing on February 17, 2010 that he had received the handbook and agreed to "read and comply with" the policies contained in it. (Exh. 2).

Defendant also undertook concerted efforts to hide his kickback payments. Though he already possessed bank accounts in both the United States and abroad, he opened an account in Hong Kong for the purpose of receiving kickback payments. As he admitted in the factual basis to his plea agreement, "In a further attempt to avoid disclosure of the supplemental income, defendant instructed a family member in the United Kingdom to structure recurring ATM cash withdrawals out of his HSBC accounts," and defendant "created a Hong Kong business entity called 'Cognisant Limited,' which he used to create invoices addressed to Fortune Packaging for services purportedly rendered in exchange for the supplemental income." (Exh. 9, at 12-13). Defendant dutifully reported his other income and foreign bank accounts, but he notably excluded his Hong Kong account -- and the $5.6 million in kickbacks he received -- from his tax filings. (Id. at 13; Exh. 17).

The fact that defendant never told Chang that they had the Thorpe family's blessing to accept kickbacks speaks volumes. Chang explained his discomfort with the kickback scheme and the fact that he eventually asked that his share of the kickbacks be directed to a third party. (Jan. 12, 2023, Tr. 78). When defendant asked Chang to print a copy of the special items ledger, the latter expressed reluctance and defendant mocked his fear. (Id. at 55-56). It defies reason that defendant truly believed that what he and Chang were doing was on the up and up but failed to disclose to his subordinate that they were, in fact, acting with company approval.

Defendant's dishonesty and dissembling further showcase his intent to defraud. During his interview with law enforcement as part

13

of this case, he falsely claimed there was no arrangement for Robust/Fortune to pay both defendant and Chang and "no collusion" between the two of them. (Exh. 18, at 13). This was a lie. It is contrary not only to Chang's testimony, but also to the bank records showing that they opened accounts at the same bank branch on the same date and received equivalent payments from Robust/Fortune consistent with the special items ledger. It is also inconsistent with defendant's text message to Chang in which he stated, "You had a good day today . . . 120 in the bank." (Exh. 5). During the same interview, he also feigned unfamiliarity with the special items ledger, claiming that he did not know how it got onto his computer and that he only saw it one time on Chang's laptop. (Exh. 18, at 12). This was also a lie -- defendant had, in fact, asked Chang to print a copy of the ledger for him. Defendant also asserted that the payments he received from Robust/Fortune were for consulting work. This too was a lie. The special items ledger -- consistent with defendant's bank records -- shows kickback payments corresponding to specific invoices and HCT orders, with payments split down the middle between defendant and Chang. During his interview with investigators from Stroz Friedberg, defendant disclaimed ownership of his company "Cognisant," stated he knew the owner but preferred not to say who that was. (Jan. 12, 2023, Tr. 95-96). Once again, defendant lied. As he later admitted as part of his plea agreement, he created "a Hong Kong business entity called 'Cognisant Limited,' which he used to create invoices addressed to Fortune Packaging for services purportedly rendered in exchange for the supplemental income." (Exh. 9, at 12-13). Defendant's dishonesty during the Stroz Friedberg

14

interview is particularly telling. If, as he now claims, he was authorized to accept payments from Robust/Fortune by no less than HCT's owner, why not say so?

The fact is, no one at HCT agreed to defendant's kickback scheme, and it is facially absurd to suggest otherwise. Defendant has exhibited a willingness to lie and cover up what he did to avoid the consequences. It is clear he now hopes to do the same before this Court.

### 2. Even Defendant's Claims Are Insufficient To Show He Acted Without Intent To Defraud

There is another problem with defendant's story. While he now concedes that he received payments from Robust/Fortune, he never characterizes these as kickback payments, instead preferring terms like "side payments" or "outside income." (CR 41, at 3, 4). Nor has he claimed to have disclosed the magnitude of the kickbacks he and Chang received from Robust/Fortune. So even if the Court were to credit defendant's belated, self-serving, and implausible claim that he informed HCT's now-deceased owner that he was receiving "side payments," that is materially different from arguing that he disclosed millions of dollars in kickback payments.

Finally, even if Tim Thorpe had been made fully aware of the contours of defendant's kickback arrangement, the blessing of HCT's CEO would not justify defendant's honest services fraud; at most, it would mean Tim Thorpe is potentially liable as well. Cf. United States v. Wallach, 935 F.2d 445, 468-69 (2d Cir. 1991) ("If all the officers and directors become a party to a scheme to use corporate assets improperly, the resulting injury to the entity and its owners

15

-- the shareholders -- is no less than when only some of the officers are involved," because "[o]fficers and directors do not have a license to plunder corporate treasuries acting individually or collectively."); United States v. Rankin, -- F. Supp. 3d --, No. 3:18-CR-272 (JAM), 2023 WL 118709, at *15 (D. Conn. Jan. 6, 2023) ("[E]ven if the defendants were right that the full board approved the trips, the defendants are wrong to claim that this would necessarily negate the government's theory of wrongdoing or criminal intent.").

## IV.   CONCLUSION

Defendant's arguments are inconsistent with the facts and the law.  The government therefore requests that this Court find that defendant, in accepting kickback payments from HCT, committed honest services fraud.  And in sentencing defendant, the Court should apply enhancements under USSG §§ 2S1.3(b)(1)(A) and 2S1.3(b)(2) because the unreported funds in defendant's foreign account were derived from criminal activity and arose from a pattern of illegal activity involving more than $100,000 in a 12-month period.

16